# ATTACHMENT "A"

**--------------------------------------------------------**

# COMPLAINT, SUMMONS & CIVIL INFORMATION SHEET
## State Court of Fulton County
## Case No. 13EV01795B

GEORGIA, FULTON COUNTY

**State Court of Fulton County**
***EFILED***
File & ServeXpress
Transaction ID: 53682712
Date: Aug 12 2013 01:00PM
Cicely Barber, Clerk
Civil Division

**STATE COURT OF FULTON COUNTY**

Civil Division

DO NOT WRITE IN THIS SPACE

CIVIL ACTION FILE NO. _____

\*\*\* NOTE-- DESIGNATED E-FILE CASE-- ANSWER AND ALL PLEADINGS MUST BE E-FILED \*\*\*\*

CONTACT THE COURT AT 404.613.5040 AND LEXISNEXIS CUSTOMER SUPPORT AT 1.888.529.7587

TRANSCARDIAC THERAPEUTICS, INC.
c/o Bird Law Group, P.C.
2170 Defoor Hills Road, Atlanta, Georgia 30318
Plaintiff's Name, Address, City, State, Zip Code

vs.

JORGE H. JIMINEZ, PH.D.
2921 Lenox Road N, Apt 212
Atlanta, Georgia 30324-2877
Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [X] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [ ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ _____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [X] NEW FILING | |
| [ ] RE-FILING: PREVIOUS CASE NO. _____ |  |

### SUMMONS

TO THE ABOVE NAMED-DEFENDANT:

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Kristen L. Beightol, Esq., Bird Law Group, P.C.

Address: 2170 Defoor Hills Road

City, State, Zip Code: Atlanta, Georgia 30318      Phone No.: 404-873-4696

An answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing through LexisNexis or, if desired, at the e-filing public access terminal in the Clerk's Office at 185 Central Ave., S.W., Room TG100, Atlanta, GA 30303.

This _____       Cicely Barber, Chief Clerk (electronic signature)

If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer. Such paragraphs undenied will be taken as true. If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

*SERVICE INFORMATION:*

Served , this _____ day of _____, 20_____.      _____

DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20_____.      _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

**State Court of Fulton County**
***EFILED***
File & ServeXpress
Transaction ID: 53682712
Date: Aug 12 2013 01:00PM
Cicely Barber, Clerk
Civil Division

GEORGIA, FULTON COUNTY

DO NOT WRITE IN THIS SPACE

## STATE COURT OF FULTON COUNTY
### Civil Division

CIVIL ACTION FILE NO. _____

*** NOTE-- DESIGNATED E-FILE CASE-- ANSWER AND ALL PLEADINGS MUST BE E-FILED ****

CONTACT THE COURT AT 404.613.5040 AND LEXISNEXIS CUSTOMER SUPPORT AT  1.888.529.7587

<u>TRANSCARDIAC THERAPEUTICS, INC.</u>

<u>c/o Bird Law Group, P.C.</u>

<u>2170 Defoor  Hills Road, Atlanta, Georgia 30318</u>

Plaintiff's Name, Address, City, State, Zip Code

### vs.

<u>VINOD H. THOURANI, M.D.</u>

<u>1210 Pine Ridge Road</u>

<u>Atlanta, Georgia 30324-2732</u>

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [X] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [ ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ _____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [X] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

### SUMMONS

TO THE ABOVE NAMED-DEFENDANT:

   You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: <u>Kristen L. Beightol, Esq., Bird Law Group, P.C.</u>

Address: <u>2170 Defoor Hills Road</u>

City, State, Zip Code: <u>Atlanta, Georgia 30318</u>                    Phone No.: <u>404-873-4696</u>

An answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED,** via electronic filing through LexisNexis or, if desired, at the e-filing public access terminal in the Clerk's Office at 185 Central Ave., S.W., Room TG100,  Atlanta, GA 30303.

This _____                    Cicely Barber, Chief Clerk (electronic signature)

   If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

   If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

### *SERVICE INFORMATION:*

   Served , this _____ day of _____, 20_____.        _____

                                                                           DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:

We, the jury, find for _____

_____

This _____ day of _____, 20_____.        _____ Foreperson

### (STAPLE TO FRONT OF COMPLAINT)

**State Court of Fulton County**
***EFILED***
File & ServeXpress
Transaction ID: 53682712
Date: Aug 12 2013 01:00PM
Cicely Barber, Clerk
Civil Division

GEORGIA, FULTON COUNTY

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**

Civil Division

CIVIL ACTION FILE NO. _____

*** NOTE-- DESIGNATED E-FILE CASE. ANSWER AND
ALL PLEADINGS MUST BE E-FILED ****

CONTACT THE COURT AT 404.613.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT  1.888.529.7587

TRANSCARDIAC THERAPEUTICS, INC. _____

c/o Bird Law Group, P.C. _____

2170 Defoor  Hills Road, Atlanta, Georgia 30318 _____

Plaintiff's Name, Address, City, State, Zip Code

vs.

AJIT YOGANATHAN, PH.D. _____

3555 Castleridge Drive _____

Tucker, Georgia 30084-3910 _____

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [X] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [ ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ _____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [X ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

## SUMMONS

TO THE ABOVE NAMED-DEFENDANT:

  You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Kristen L. Beightol, Esq., Bird Law Group, P.C. _____

Address: 2170 Defoor Hills Road _____

City, State, Zip Code: Atlanta, Georgia 30318 _____        Phone No.: 404-873-4696 _____

An answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing through LexisNexis or, if desired, at the e-filing public access terminal in the Clerk's Office at 185 Central Ave., S.W., Room TG100,  Atlanta, GA 30303.

This _____        Cicely Barber, Chief Clerk (electronic signature)

   If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

   If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

*SERVICE INFORMATION:*

 Served , this _____ day of _____, 20_____.        _____

                                                                    DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:

We, the jury, find for _____

_____

This _____ day of _____, 20_____.     _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
***EFILED***
File & ServeXpress
Transaction ID: 53682712
Date: Aug 12 2013 01:00PM
Cicely Barber, Clerk
Civil Division

GEORGIA, FULTON COUNTY

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**

Civil Division

CIVIL ACTION FILE NO. _____

\*\*\* NOTE-- DESIGNATED E-FILE CASE--ANSWER AND ALL PLEADINGS MUST BE E-FILED \*\*\*\*

CONTACT THE COURT AT 404.613.5040 AND LEXISNEXIS CUSTOMER SUPPORT AT 1.888.529.7587

TRANSCARDIAC THERAPEUTICS, INC. _____

c/o Bird Law Group, P.C. _____

2170 Defoor Hills Road, Atlanta, Georgia 30318 _____

Plaintiff's Name, Address, City, State, Zip Code

**vs.**

EMORY UNIVERSITY _____

c/o registered agent, Melinda Simon _____

201 Dowman Dr., 101 Administration Building _____

Atlanta, GA 30322 _____

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [X] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [ ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ _____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [X] NEW FILING | |
| [ ] RE-FILING: PREVIOUS CASE NO. _____ | |

### SUMMONS

TO THE ABOVE NAMED DEFENDANT:

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Kristen L. Beightol, Esq., Bird Law Group, P.C. _____

Address: 2170 Defoor Hills Road _____

City, State, Zip Code: Atlanta, Georgia 30318 _____    Phone No.: 404-873-4696 _____

An answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing through LexisNexis or, if desired, at the e-filing public access terminal in the Clerk's Office at 185 Central Ave., S.W., Room TG100, Atlanta, GA 30303.

This _____    Cicely Barber, Chief Clerk (electronic signature)

If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer. Such paragraphs undenied will be taken as true. If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

### *SERVICE INFORMATION:*

Served , this _____ day of _____, 20_____.    _____

DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:

We, the jury, find for _____

_____

This _____ day of _____, 20_____.    _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

**State Court of Fulton County**
***E-FILED***
File & ServeXpress
Transaction ID: 53682712
Date: Aug 12 2013 01:00PM
Cicely Barber, Clerk
Civil Division

GEORGIA, FULTON COUNTY

DO NOT WRITE IN THIS SPACE

## STATE COURT OF FULTON COUNTY
### Civil Division

CIVIL ACTION FILE NO. _____

\*\*\* NOTE-- DESIGNATED E-FILE CASE --ANSWER AND ALL PLEADINGS MUST BE E-FILED \*\*\*\*
CONTACT THE COURT AT 404.613.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT  1.888.529.7587

TRANSCARDIAC THERAPEUTICS, INC. _____
c/o Bird Law Group, P.C. _____
2170 Defoor  Hills Road, Atlanta, Georgia 30318 _____
Plaintiff's Name, Address, City, State, Zip Code

vs.

GEORGIA TECH FOUNDATION, INC. _____
registered agent, Mark W. Long _____
760 Spring Street _____
Atlanta, GA 30308 _____
Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [  ] ACCOUNT | PRINCIPAL $_____ |
| [X] CONTRACT | |
| [  ] NOTE | INTEREST $_____ |
| [  ] TORT | |
| [  ] PERSONAL INJURY | ATTY. FEES $_____ |
| [  ] FOREIGN JUDGMENT | |
| [  ] TROVER | COURT COST $ _____ |
| [  ] SPECIAL LIEN | |
| | ************ |
| [X ] NEW FILING | |
| [  ] RE-FILING:  PREVIOUS CASE NO. _____ | |

### SUMMONS

TO THE ABOVE NAMED DEFENDANT:

  You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Kristen L. Beightol, Esq., Bird Law Group, P.C. _____

Address: 2170 Defoor Hills Road _____

City, State, Zip Code: Atlanta, Georgia 30318 _____     Phone No.: 404-873-4696 _____

An answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing through LexisNexis or, if desired, at the e-filing public access terminal in the Clerk's Office at 185 Central Ave., S.W., Room TG100,  Atlanta, GA 30303.

This _____     Cicely Barber, Chief Clerk (electronic signature)

    If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.
    If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

### SERVICE INFORMATION:
 Served , this _____ day of _____, 20_____.     _____
                                                                                                          DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20_____.     _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

**State Court of Fulton County**
***E-FILED***
File & ServeXpress
Transaction ID: 53682712
Date: Aug 12 2013 01:00PM
Cicely Barber, Clerk
Civil Division

GEORGIA, FULTON COUNTY

DO NOT WRITE IN THIS SPACE

## STATE COURT OF FULTON COUNTY
### Civil Division

CIVIL ACTION FILE NO. _____

*** NOTE-- DESIGNATED E-FILE CASE -- ANSWER AND ALL PLEADINGS MUST BE E-FILED ****
CONTACT THE COURT AT 404.613.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT  1.888.529.7587

TRANSCARDIAC THERAPEUTICS, INC. _____

c/o Bird Law Group, P.C. _____

2170 Defoor Hills Road, Atlanta, Georgia 30318 ____

Plaintiff's Name, Address, City, State, Zip Code

vs.

GEORGIA TECH RESEARCH CORPORATION _____

c/o registered agent, Holmes Hawkins, King & Spalding

1180 Peachtree St., NE _____

Atlanta, GA 30309 _____

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [  ] ACCOUNT | PRINCIPAL $_____ |
| [X] CONTRACT | |
| [  ] NOTE | INTEREST $_____ |
| [  ] TORT | |
| [  ] PERSONAL INJURY | ATTY. FEES $_____ |
| [  ] FOREIGN JUDGMENT | |
| [  ] TROVER | COURT COST $ _____ |
| [  ] SPECIAL LIEN | |
| | ************ |
| [X ] NEW FILING | |
| [  ] RE-FILING:  PREVIOUS CASE NO. _____ | |

### SUMMONS

TO THE ABOVE NAMED DEFENDANT:

  You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Kristen L. Beightol, Esq., Bird Law Group, P.C. _____

Address: 2170 Defoor Hills Road _____

City, State, Zip Code: Atlanta, Georgia 30318 _____        Phone No.: 404-873-4696 _____

An answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing through LexisNexis or, if desired, at the e-filing public access terminal in the Clerk's Office at 185 Central Ave., S.W., Room TG100,  Atlanta, GA 30303.

This _____                Cicely Barber, Chief Clerk (electronic signature)

  If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

  If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

## SERVICE INFORMATION:

 Served , this _____ day of _____, 20_____.        _____

                                                                                                      DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:

We, the jury, find for _____

_____

This _____ day of _____, 20_____.        _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

**State Court of Fulton County**
***EFILED***
File & ServeXpress
Transaction ID: 53613255
Date: Aug 09 2013 01:17PM
Cicely Barber, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| TRANSCARDIAC THERAPEUTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO. _____ |
| | ) | |
| AJIT YOGANATHAN, PH.D., JORGE H. | ) | |
| JIMINEZ, PH.D., VINOD H. THOURANI, | ) | **JURY TRIAL DEMANDED** |
| M.D., EMORY UNIVERSITY, GEORGIA | ) | |
| TECH RESEARCH CORPORATION, and | ) | |
| GEORGIA TECH FOUNDATION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff TransCardiac Therapeutics, Inc. hereby files the above-styled Complaint and shows this Court the following:

## PARTIES, JURISDICTION AND VENUE

1.

TransCardiac Therapeutics, Inc. is a Georgia corporation with a principal office address and registered agent in Gwinnett County, Georgia.

2.

Defendant Ajit P. Yoganathan, Ph.D. ("Yoganathan") was at all times material hereto an engineer performing research in areas including fluid mechanics of the heart and tests on the mechanical heart.

3.

Defendant Yoganathan is subject to the jurisdiction of this Court and may be personally served with process in accordance with O.C.G.A. § 9-11-4.

1

4.

Defendant Yoganathan resides in DeKalb County, Georgia, at 3555 Castleridge Drive, Tucker, Georgia.

5.

Defendant Jorge H. Jiminez, Ph.D. ("Jiminez") was at all times material hereto a research engineer in the field of biomedical engineering.

6.

Upon information and belief, Defendant Jiminez resides in Fulton County, Georgia.

7.

Defendant Jiminez may be personally served with process pursuant to O.C.G.A. § 9-11-4.

8.

Defendant Vinod H. Thourani, M.D. ("Thourani") was at all material times hereto a physician licensed to practice in the State of Georgia, who was practicing within the specialty of cardiothoracic surgery.

9.

Defendant Thourani resides in DeKalb County, Georgia at 1210 Pine Ridge Road, Atlanta, Georgia 30324-2732, and may be served with process at that address.

10.

Defendant Emory University ("Emory") is a Georgia professional corporation capable of being sued in Georgia and subject to the jurisdiction of this Court.

11.

Defendant Emory conducts business in Fulton County, Georgia at 550 Peachtree Street, Atlanta, Georgia, in conjunction with Crawford Long Hospital, recently renamed to Emory

University Hospital at Midtown, and with the joint Biomedical Engineering Department for Georgia Institute of Technology ("Georgia Tech") and Emory, located at corner of Ferst and Atlantic Drives on Georgia Tech's campus in Atlanta, Georgia, and it may be served with process upon its registered agent, Melinda Simon, at 201 Dowman Drive, 101 Administration Building, Atlanta, Dekalb County, Georgia 30322.

12.

Defendant Georgia Tech Research Corporation ("GTRC") is a Georgia corporation capable of being sued in Georgia and subject to the jurisdiction of this Court.

13.

Defendant GTRC's principal office address is 505 Tenth Street – Georgia Tech, Atlanta, Fulton County, Georgia 30332-0415 and it may be served with process upon its registered agent, Holmes Hawkins, King & Spalding, 1180 Peachtree St., NE, Atlanta, Fulton County, Georgia 30309.

14.

Defendant Georgia Tech Foundation, Inc. ("GTF") is a Georgia corporation capable of being sued in Georgia and subject to the jurisdiction of this Court.

15.

Defendant GTF's principal office address is 760 Spring Street, 4th Floor, Atlanta, Fulton County, Georgia 30308 and it may be served with process upon its registered agent, Mark W. Long, 760 Spring Street, Atlanta, Fulton County, Georgia, 30308.

16.

At all times material hereto, Defendant Yoganathan was an employee and/or agent of Defendant Emory.

3

17.

At all times material hereto, Defendant Yoganathan was acting within the course and scope of his employment and/or agency with Defendant Emory.

18.

Defendant Emory is vicariously liable for the actions and/or inactions of its employees and/or agents, including but not necessarily limited to Defendant Yoganathan pursuant to the doctrine of *respondeat superior* and/or agency.

19.

At all times material hereto, Defendant Yoganathan was an employee and/or agent of Defendant GTRC.

20.

At all times material hereto, Defendant Yoganathan was acting within the course and scope of his employment and/or agency with Defendant GTRC. Furthermore, to the extent that the breaches of duties and laws herein described are willful and intentional, such acts have been ratified by GTRC.

21.

Defendant GTRC is vicariously liable for the actions and/or inactions of its employees and/or agents, including but not necessarily limited to Defendant Yoganathan pursuant to the doctrine of *respondeat superior* and/or agency.

22.

At all times material hereto, Defendant Yoganathan was an employee and/or agent of Defendant GTF.

23.

At all times material hereto, Defendant Yoganathan was acting within the course and scope of his employment and/or agency with Defendant GTF.   Furthermore, to the extent that the breaches of duties and laws herein described are willful and intentional, such acts have been ratified by GTF.

24.

Defendant GTF is vicariously liable for the actions and/or inactions of its employees and/or agents, including but not necessarily limited to Defendant Yoganathan pursuant to the doctrine of *respondeat superior* and/or agency.

25.

At all times material hereto, Defendant Jiminez was an assistant and agent of Defendant Yoganathan, and a Ph.D. student in the joint GT/Emory Biomedical Engineering Department and bound by the rules and policies of Emory, Georgia Tech and joint master agreement for GT/Emory Biomedical Engineering Department.

26.

At all times material hereto, Defendant Jiminez was acting within the course and scope of his employment and/or agency with Defendant Yoganathan.  Furthermore, to the extent that the breaches of duties and laws herein described are willful and intentional, such acts have been ratified by Defendants Yoganathan, GTRC, GTF and Emory.

27.

Defendant Yoganathan is vicariously liable for the actions and/or inactions of its employees and/or agents, including but not necessarily limited to Defendant Jiminez pursuant to the doctrine of *respondeat superior* and/or agency.

28.

At all times material hereto, Defendant Jiminez was an employee and/or agent of Defendant GTRC.

29.

At all times material hereto, Defendant Jiminez was acting within the course and scope of his employment and/or agency with Defendant GTRC.    Furthermore, to the extent that the breaches of duties and laws herein described are willful and intentional, such acts have been ratified by GTRC.

30.

Defendant GTRC is vicariously liable for the actions and/or inactions of its employees and/or agents, including but not necessarily limited to Defendant Jiminez pursuant to the doctrine of *respondeat superior* and/or agency.

31.

At all times material hereto, Defendant Jiminez was an employee and/or agent of Defendant GTF.  Furthermore, to the extent that the breaches of duties and laws herein described are willful and intentional, such acts have been ratified by GTF.

32.

At all times material hereto, Defendant Jiminez was acting within the course and scope of his employment and/or agency with Defendant GTF.    Furthermore, to the extent that the breaches of duties and laws herein described are willful and intentional, such acts have been ratified by GTF.

33.

Defendant GTF is vicariously liable for the actions and/or inactions of its employees

6

and/or agents, including but not necessarily limited to Defendant Jiminez pursuant to the doctrine of *respondeat superior* and/or agency.

34.

At all times material hereto, Defendant Thourani was an employee and/or agent of Defendant Emory University.

35.

At all times material hereto, Defendant Thourani was acting within the course and scope of his employment and/or agency with Defendant Emory.

36.

Defendant Emory is vicariously liable for the actions and/or inactions of its employees and/or agents, including but not necessarily limited to Defendant Thourani pursuant to the doctrine of *respondeat superior* and/or agency.

37.

At all times relevant hereto, Defendant Emory had ownership rights of Defendant Thourani's intellectual property.

38.

At all times relevant hereto, Defendant Thourani had a duty to disclose his intellectual property to Defendant Emory.

39.

Venue in this action is proper in Fulton County.

## **FACTS**

40.

The allegations of the foregoing paragraphs are incorporated herein by reference as if

fully set forth.

41.

At all relevant times hereto, Omar Lattouf, M.D., Ph.D. ("Dr. Lattouf") was a Professor of Surgery at Defendant Emory's School of Medicine's Department of Surgery, Division of Cardiothoracic Surgery.

42.

On December 8, 2001, Dr. Lattouf filed U.S. Patent Application No. 60/340,062, which was titled "Endoscopic transthoracic Epicardiac, Endocardiac and Endoaortic/Endovascular Interventional Therapy".    In the registration records of the European Commission, this first patent therein listed is titled the "Apical Instrument Port" with a priority date of December 8, 2001.

43.

Dr. Lattouf disclosed his invention to Defendant Emory as Emory University Invention Disclosure No. 02019, titled "Thoracoscopic Epicardiac, Endoventricular and Endoarterial Intervention"

44.

Thereafter, on September 25, 2002, Frank Stout, Vice President for Research Administration of Defendant Emory University's Office of Technology Transfer ("OTT"), wrote Dr. Lattouf "to release and to assign Emory University's ("Emory") ownership rights and interest in and to the above-identified Intellectual Property (hereinafter "IP")"[1] subject to identified

---

[1] The "above-identified Intellectual Property" was:

       U.S. Patent Application No. 60/340,062
       Titled: "Endoscopic transthoracic Epicardiac, Endocardiac and Endoaortic/Endovascular Interventional Therapy"
       Emory University Invention Disclosure Number: 02019
       Titled: "Thoracoscopic Epicardiac, Endoventricular and Endoarterial Intervention"

terms.[2]  The Release Letter is attached as Exhibit A.

45.

The Release Letter explained that if Dr. Lattouf "or any licensee, assignee or affiliate of [his]; by any company(s) in which [he] has equity or any other financial interest, or any licensee, assignee or affiliate of the same (hereinafter "Lattouf Startup"); or by any entities resulting from a merger or acquisition involving a Lattouf Startup. . ." sells product(s) incorporating the IP, Dr. Lattouf "will pay, or cause to be paid, to Emory, two percent (2%) of the Net Sales for each six month period commencing on the Acknowledgement Date . . ."  See Exhibit A.

46.

As required by the first term of the Release Letter, Dr. Lattouf signed that he accepted and agreed to all terms in the letter on September 28, 2002 and the letter was received and acknowledged by OTT as evidenced by the September 30, 2002 signature of Mary Severson, Ph.D., J.D., Assistant Vice President and Director of OTT.

47.

The Release Letter IP is Dr. Lattouf's invention and was his property.

48.

TransCardiac Therapeutics, LLC was registered as a limited liability company with the Georgia Secretary of State on September 4, 2003.   On April 30, 2008, TransCardiac Therapeutics, LLC was converted into TransCardiac Therapeutics, Inc., a Georgia corporation. TransCardiac Therapeutics, LLC and TransCardiac Therapeutics, Inc. will hereinafter collectively be referred to as "TCT" or "Plaintiff."

---

Hereinafter, such Intellectual Property will be referred to as "Release Letter IP".
[2] Hereinafter, Stout's September 25, 2002 letter including Lattouf and Mary Severson, Ph.D.'s signatures will be referred to as "Release Letter".

49.

TransCardiac Therapeutics, LLC was formed for the purpose of holding, developing and attempting to commercialize the prior inventions of Dr. Lattouf for the benefit of its shareholders and Defendant Emory as royalty stakeholder.

50.

The formation of such an entity for that purpose was made with the knowledge, consent and encouragement of Defendant Emory as a normal and prudent step toward commercialization following Defendant Emory's Release Letter.

51.

Thereafter, Defendant Emory acknowledged Plaintiff as the beneficial owner of the Release Letter IP. Defendant Emory has listed TCT as part of Defendant Emory's Portfolio of Start-Ups and therein acknowledged its technologies, including stating that "TCT has patented technology in repairing heart valves and is looking into creating minimally invasive valve replacement systems."

52.

Defendant Emory and TransCardiac Therapeutics, LLC, as the successor to the beneficial interests of Dr. Lattouf in the inventions, were in a confidential relationship by virtue of the required disclosures to Emory for inventions and the joint interests of in the inventions and technology subsequent to the Release Letter, and thereafter their long term, ostensible, joint efforts to promote the technology for the benefit of TransCardiac Therapeutics LLC, as owner, and itself as royalty holder.

53.

After the Release Letter, Todd T. Sherer, Ph.D. ("Dr. Sherer"), became Director of the

Office of Technology Transfer for Defendant Emory and Defendant Emory became more focused on potential retention of technology rights and maximizing value of inventions for the benefit of Defendant Emory.

54.

In late 2004, Dr. Lattouf had disclosed subsequent inventions to Defendant Emory, which were sequels to earlier inventions, and beneficially owned by TransCardiac Therapeutics LLC, and Dr. Sherer expressed his interest in taking a hard look at prior Release and the prospective one.

55.

In further evidence of their confidential relationship and to facilitate complete exposition of the technology, including prior and prospective release matters Dr. Sherer and Ahmed H. Zakii for TransCardiac Therapeutics, LLC signed a document entitled "Confidential Disclosure Agreement" ("CDA") in December, 2004. The CDA is attached as Exhibit B.

56.

The December 2004 CDA explained that Defendant Emory and TransCardiac Therapeutics, LLC "intend[ed] to engage in discussions to permit the parties to evaluate their mutual interests in entering a possible business relationship regarding TransCardiac Therapeutics, LLC (Evaluation)." *See* Exhibit B. Defendant Emory never terminated this CDA, which required confidentiality for eight years, on top of that required by its relationship with Plaintiff.

57.

After Dr. Sherer approved both the Release Letter and the First Amendment (discussed below) in 2005 and at all times thereafter prior to January of 2011, Defendant Emory continued

to affirm confidential relations with TCT, as a pattern and practice, in tandem with that relationship contractually, as follows:

a)  Dr. Lattouf, as founder and inventor for the TCT technology was required to provide Emory updates on technology and TCT's IP as instructed by Dr. Sherer and Jennifer Moore of Emory; and

b) Defendant Emory, through Dr. Sherer, continually emphasized the commonality of interest of Emory in TCT's IP[3], which was its royalty interest and knowledge of that IP, and led TCT to believe that close and regular contact would be beneficial to both parties, due to Defendant Emory's knowledge of opportunities and range of influence and powers relative to development and commercialization and as a part of Defendant Emory's department to aid affiliated startups; and toward that end, TCT presented its knowledge of opportunities to Defendant Emory for review, comment or approval.

58.

Defendant Emory regularly treated Dr. Lattouf as a representative of Plaintiff because he was the inventor of the TCT's IP, its founder, its scientific advisory board member, a major shareholder and one who played a role in raising funds from investors in TCT based on the releases from Defendant Emory and encouragement of commercialization, one with knowledge of TCT's officers and representatives, and the one most likely to be abreast of the latest developments and improvements to the IP in which Defendant Emory and TCT held an interest, and the representative of TCT instructed to provide updates to Defendant Emory on demand regarding improvements and developments to TCT's technology and IP, and of necessity and obligation, the one who alerted Defendant Emory and all Defendants to their

---

[3] Intellectual property herein shall sometimes be referred to as simply "IP".

breaches of duty to TCT.   However, Dr. Lattouf diligently recognized TCT's corporate officers to Defendant Emory, who also met with Dr. Sherer on important occasions.

59.

Defendant Thourani became a member of the TransCardiac Therapeutics, LLC Scientific Advisory Board ("SAB") in 2005, and served without resignation and attended and participated in periodic meetings.   At the time of his appointment and agreement to serve, Defendant Thourani agreed to respect and protect the proprietary information and intellectual property of TCT and to keep confidential all confidential information, and on the basis of that promise and agreement to serve TCT loyally, he then and thereafter received confidential and proprietary information and knowledge of the intellectual property of TCT (as invented by Dr. Lattouf).

60.

On Monday, January 10, 2005, David Fields, on behalf of TransCardiac Therapeutics, LLC, emailed Dr. Sherer to recap the following points discussed at a meeting the prior Friday:

> 1) TCT requests affirmation of the release on all the related IP that has been disclosed to Emory
> 2) Emory will receive royalty payments across all the IP at the rate already in the current agreement
> 3) TCT would like to review and possibly revise the wording regarding future improvements to the IP in order to facilitate a close working relationship with Emory without the potential loss of IP to the company
> 4) In exchange for the following (or some combination):
> - strong active support from Emory to help TCT become viable
> - a reduction in royalty (i.e. lower percentage or changing from Net Sales to Gross or Net Profit)
> - some initial capital investment
> TCT will provide Emory with equity in the company relative to Emory's contribution.

61.

The following day, on January 11, 2005, Dr. Sherer responded that Defendant Emory did not believe "the waiver" (i.e., the Release Letter) was sufficient "as it [did] not include two

provision patent applications that where [sic] filed, but not disclosed, [sic] prior to the execution of the waiver" and that, to address that potential deficiency, "Emory will want to take a second 'bite at the apple.'"

62.

Dr. Sherer's January 11 email further explained that TransCardiac Therapeutics, LLC's request for additional support from Defendant Emory would "be the fun the [sic] part as my office [was] very interested in getting more involved in these opportunities" and that "[m]ost of this kind of support can be provided by Defendant Emory simply because we are a committed stakeholder in the success of TCT."

63.

In his January 11 email, Dr. Sherer acknowledged that "you should expect that my office will want to secure the strongest opportunity for Defendant Emory that can reasonably achieved", but also that, "[i]n the end, I fully understand that everyone needs to be left with sufficient incentive to assure our combined success!"

64.

Dr. Sherer's January 11 email explained that: "I make no apologies for being aggressive about pursing the best deal possible for Emory."

65.

By February 11, 2005, agreed upon revisions to the Release Letter had still not been accomplished.

66.

As Dr. Lattouf explained in a February 11, 2005 letter to Dr. Sherer, based on the Release Letter and his understanding through conversations with OTT, Dr. Lattouf "went ahead full force

on [his] own to develop and protect this technology at his own expense", went "to the extreme effort and additional expense to prototype devices and procedures and to build a network of support for the technology [he] developed", expended "substantial personal resources to create value in this technology, and then went out to pursue external funding to expedite the development process."

67.

Dr. Lattouf's February 11 letter explained that he had hoped OTT's recent involvement in response to his search for additional capital "would speed [his] search for capital and support but instead [had] turned into [him] having to defend and negotiate for the IP that [he] was led to believe was already released to [him] or [he] would never have made the personal investment of time and money to develop as far as [he] [had]."

68.

The communications between Dr. Lattouf, TransCardiac Therapeutics, LLC and Dr. Sherer resulted in a February 17, 2005 "AMENDMENT TO THE RELEASE LETTER between EMORY UNIVERSITY and OMAR M. LATTOUF, M.D., PH.D."[4], which explained that Dr. Lattouf had created certain improvements to his 2001 IP and that Defendant Emory desired to release and assign those improvements to Dr. Lattouf.  The First Amendment is attached hereto as Exhibit C.

69.

The improvements referenced in the First Amendment included the following:

- U.S. Provisional Patent Application No. 60/365,918 titled "Off Pump Mitral Valve Repair Utilizing Endocardiac Stapling Device"
- U.S. Provisional Patent Application No. 60/369,988 titled "Off Pump Mitral Valve Repair Utilizing Endocardiac Catheter-Based Stapling Device"

---

[4] (hereinafter "First Amendment")

15

- U.S. Patent Application No. 10/313,198 titled "Treatments for a Patient with Congestive Heart Failure"
- U.S. Patent Application No. 10/295,390, titled "Treatments for a Patient with Congestive Heart Failure"
- Issued patents disclosing and claiming the IP, together with any and all extensions, divisionals, continuations, reexamined and reissued patents, and foreign counterparts of such patents which issue thereon.[5]

*See* <u>Exhibit C</u>.

70.

The First Amendment Improvements are Dr. Lattouf's inventions and were his property as inventor, although the beneficial ownership of such assets and IP belonged to TransCardiac Therapeutics LLC, as licensee and assignee and provider of funds for patent applications, development efforts, and all expenses associated with the IP.

71.

The First Amendment explained that it was "[s]ubject to all conditions and terms of the Release Letter, Emory and the Inventor hereby include the Improvements in the IP released and assigned pursuant to the Release Letter." *See* <u>Exhibit C</u>.

72.

Dr. Lattouf and David Field of MLN Consulting, Incorporated ("MLN"), a consultant to TCT, met with Ann Schmierer, Lee Herron and Defendant Yoganathan on February 5, 2005, (herein the "Meeting") to explore availability of testing labs and to seek assurance of protection of proprietary information disclosed in conjunction therewith.

73.

Mr. Herron and Ms. Schmierer and Defendant Yoganathan were each understood to be representatives of Defendant GTRC, which is affiliated with the Georgia Tech Venture Labs and

---

[5] These improvements will hereinafter be referred to as "First Amendment Improvements".

holds its technology, and Defendant GTF, for the purpose of communicating Defendant GTF's terms as recipient of funds paid for services (use of personnel and facilities), in tandem with Defendant GTRC, and for the purpose of affirming protection of proprietary and confidential knowledge and intellectual property of guests and fellow faculty of the joint Defendant Emory/Georgia Tech biomedical engineering department and labs.

74.

At the meeting, Defendant Yoganathan, Ms. Schmierer and Mr. Herron, who were understood to represent Georgia Tech and its affiliates in multiple capacities, unequivocally and strongly affirmed that all proprietary information, confidential information and intellectual property of Dr. Lattouf (as the heart surgeon inventor and originator/owner and chief scientific advisor for TCT) and TCT (as the owner/developer company) would be protected, and not disclosed to anyone.    They further affirmed and explained that such protection and confidentiality were fundamental to the institution and its testing facilities.

75.

At the meeting, TCT and Dr. Lattouf explained that Defendant Emory had released and assigned the proprietary information, confidential information and intellectual property to Dr. Lattouf for creation of a company for development and commercialization, and that all had been assigned to TCT, which was formed for that purpose.

76.

Defendants Yoganathan, Ms. Schmierer, and Mr. Herron also promised to deliver an acceptable non-disclosure agreement which matched their representations.

77.

At the meeting, Defendant Yoganathan, Ms. Schmierer and Mr. Herron, as an advance disclosure, disclosed that the only remotely related invention to Dr. Lattouf's area of interest was Defendant Yoganathan's invention of an annuloplasty chain, which was disclosed and agreed not to compete in any manner with Dr. Lattouf's and TCT's area of interest, so the assurances of absolute protection were affirmed.

78.

At the meeting, TCT was encouraged to apply for a grant from the Georgia Research Alliance, which was requested, but was denied.

79.

By email of March 22, 2005 to Defendant Yoganathan and Mr. Herron, Dr. Lattouf asked for a price quote for building and testing his invention.

80.

The price for the work and services of Defendant Yoganathan and his assistant, Defendant Jimenez, and their testing labs (granted and approved by Defendant GTRC) was $10,000, required to be paid to GTF. Such $10,000 was paid from Dr. Lattouf's Defendant Emory Discretionary Fund on July 26, 2005. TCT understood this relationship and services to be work for hire.

81.

TCT relied upon the oral assurances received, plus the known policies for protection of such personal property, plus the relationships formed by contract for services, plus for consultancy as a member of the Scientific Advisor Board.

82.

On occasion when Dr. Lattouf would mention his concern about the inability to locate the promised non-disclosure agreement for the protection of Lattouf  and TCT to Defendant Yoganathan, Defendant Yoganathan would remind Lattouf that he was fully protected in any event, even if misplaced, because: 1) he, Defendant Yoganathan, was on the faculty of Defendant Emory and prohibited by its policies from taking the intellectual property of another and 2) was bound by the terms of the Dr. Lattouf Release Letter, and  3) that Defendant Emory and Georgia Tech had a joint Master Agreement which imposed such ethical standards, including protection of intellectual property, on all faculty and students so that Dr. Lattouf and TCT were fully protected.

83.

In order to confirm Defendant Yoganathan's assurances, Dr. Lattouf investigated and confirmed that Defendant Yoganathan actually held classes as teaching professor on the Defendant Emory campus, and Defendant Yoganathan listed his faculty position on his official business card.

84.

No non-disclosure agreement as promised in the Meeting in February of 2005 at Georgia Tech was ever presented, but the assurances of confidentiality and protection were strong and not dependent upon any writing.

85.

Dr. Lattouf discovered blank forms apparently for such purpose on his computer in 2010 in name of David Field's company, which he forwarded to Mr. Field, but they had never been

seen.   The full story is recounted in Dr. Lattouf's letter of Nov. 16, 2012, with Affidavit of Mr. Field annexed.  No substantive response was received from the Defendants relative to this.

86.

These blank forms disclose the "annuloplasty chain" invention as the sole exception, but were not in TCT or Dr. Lattouf's name, and when read in late 2012, it was noticed that these forms, despite the appearance of a form to protect a guest using testing facilities, protected absolutely nothing for a visitor to Georgia Tech's labs and would have operated to defraud anyone who relied thereon for protection.

87.

In the total context of the facts, these forms were platforms for fraud as will be even more evident from the current ads for investors for transapical access at Venture Labs, as well as the lack of interest by Defendant GTRC and Defendant GTF in these facts.

88.

The forms protected only Defendant GTRC and GT, and actually harmed any user as it permitted publication of the tests, and were inconsistent with the representations and oral promises and policies and were never timely or forthrightly presented and never used.

89.

Beginning in 2005 and continuing thereafter, Defendants Yoganathan and Jiminez, as Defendant Yoganathan's assistant, built, tested and researched Dr. Lattouf's Release Letter IP, First Amendment Improvements and subsequent improvements at Georgia Institute of Technology laboratories.

90.

The  required $10,000 payment to Defendant GTF, which was operating in tandem with

Defendant GTRC, to provide the services for compensation was paid by Dr. Lattouf from his Emory Discretionary Fund for the benefit of TCT.

91.

Defendants Yoganathan and Jiminez as well as Defendants GTRC and GTF, through their agents and/or employees, agreed to keep confidential and not to use for their own benefit the information Dr. Lattouf shared in order for the building, testing and research to be performed.

92.

Defendants Yoganathan and Jiminez performed the building, testing and research and, along with GTRC and GTF, agreed to keep Dr. Lattouf's confidence in exchange for $10,000, which Dr. Lattouf paid Defendant GTF on July 26, 2005 out of his Defendant Emory Discretionary Fund.

93.

Also in 2005 and thereafter, Dr. Lattouf shared information regarding his Release Letter IP, First Amendment Improvements and additional improvements with Defendant Thourani, only after obtaining Defendant Thourani's agreement to keep the information confidential and respect and protect the intellectual property of TCT, and not to use the information for his own benefit.

94.

Indeed, relying on Defendant Thourani's agreement to respect and protect the proprietary information and intellectual property of TCT, as well as keep Dr. Lattouf's inventions (as assigned to TCT) confidential, Dr. Lattouf taught Defendant Thourani the transapical access and chordal replacement methods and entrusted Defendant Thourani to continue the building, testing and research that he had had been directing at Georgia Institute of Technology laboratories.

95.

On December 8, 2005, Dr. Sherer, and Jennifer Moore, met with Dr. Lattouf to discuss Defendant Emory's interest in encouraging TransCardiac Therapeutics LLC to merge its technology (as evidenced by the Release Letter IP, First Amendment Improvements and any additional improvements.—as then owned by TCT) with technology invented by Tom Vassiliades, M.D. surgeon at Defendant Emory (such technology owned by Defendant Emory and Defendant GTRC) as a part of a transaction which would re-negotiate and re-cast the interest of Defendant Emory in TCT's technology, so that Defendant Emory would become the owner of that technology and increase its financial stake.

96.

On December 10, 2005, Dr. Lattouf emailed Dr. Sherer, among others, explaining that his Release Letter IP and First Amendment Improvements had been irrevocably licensed to TransCardiac Therapeutics, LLC, "which in turn [had] initiated a series of actions and commitments that are difficult, if not impossible, to dismantle" and confirming his offer to facilitate discussions between Defendant Emory, Dr. Vassiliades, TransCardiac Therapeutics, LLC and its officers.

97.

Dr. Sherer had proposed to create ValveCo and merge the technology of TCT with that owned by Defendant Emory (and invented by Dr. Vassiliades). Though this proposal was never seriously entertained by the parties, and was described by Dr. Vassiliades as incompatible at the outset, but it did demonstrate Dr. Sherer's keen interest in TCT's technology, and in that proposal process he had contact with multiple corporate agents of TCT and even arranged for TCT's chairman to listen by phone connection to Dr. Sherer's presentation.

98.

Defendant GTRC was a participant in this effort (and named on the circulated non-disclosure agreement, which was not signed). However, Sherer apparently did not know initially the extent of Defendant GTRC's interest, as no split was accorded them in his initial financial projections, but Defendant GTRC was privy to TCT's technology, as trusted provider of facilities and services, and an assignee along with Emory for Dr. Vassiliades' patent).  Upon information and belief, this transaction reflected the interest of both Defendant Emory and Defendant GTRC in TCT's technology, but Defendant Emory may have been unaware of the extent of interest by GTRC.

99.

Defendant Yoganathan agreed to be a member of and serve on the Scientific Advisory Board of TCT from its formation in 2005, and served without resignation and attended and participated in periodic meetings.

100.

At the time of his appointment and agreement to serve, Defendant Yoganathan agreed to respect and protect the proprietary information and intellectual property of TCT and to keep confidential all confidential information, and on the basis of that promise and agreement to serve TCT loyally.

101.

He then and thereafter received confidential and proprietary information and knowledge of the intellectual property of TCT (as invented by Dr. Lattouf).

102.

In 2005, Defendant Yoganathan and his assistant, Defendant Jimenez, assisted TCT in

the procurement of non-disclosure agreements for the benefit of TCT from third parties, including representatives of St. Jude Medical, which also acknowledged that the IP belonged exclusively to TCT.

103.

After having served for several years on TCT's Scientific Advisory Board, on January 15, 2008, Defendant Yoganathan signed a TCT Scientific Advisory Board Agreement ("SABA"), noting and initialing beside the conflict of interest paragraph that he consulted "with other companies, big + small, who work in the heart valve repair and replacement fields." Defendant Yoganathan's SABA is attached as Exhibit D.

104.

Defendant Yoganathan served on the SAB continuously and never resigned.

105.

Defendant Thourani also agreed to be a member and serve on the Scientific Advisory Board of TCT from its formation in 2005 and so served.

106.

On July 29, 2008, Defendant Thourani signed a similar SABA, with no applicable exceptions and acknowledged that all inventions belong to TCT.

107.

Defendant Thourani never resigned from the SAB, but TCT discovered in late 2012 from Defendant Thourani's curriculum vitae that he, without notice to TCT, joined the Scientific Advisory Board of a competitor, MitralSolutions, Inc. ("MitralSolutions") in 2007, and that he viewed himself, again without notice to TCT, as not being on TCT's SAB after 2009.

24

108.

The exceptions to the confidentiality in Defendant Thourani's SABA also do not apply to the Release Letter IP, the First Amendment Improvements or any subsequent additional improvements.

109.

Affirmation of close confidential relations between TCT and Defendant Emory, though Dr. Sherer's OTT, were continual due to the Release Letter and the amendments thereto, and the role of the OTT.  Representative of that are the first two sentences of the email of Amin Rahme to Dr. Sherer, *et al*. of April 21, 2007: "Many thanks for your kind words and support.  We always feel that we are partners with Emory/OTT and our success is yours as well."

110.

In November of 2007, Dr. Sherer was invited to attend a TCT Board Meeting and also to join its Business Advisory Board, the latter of which he declined.

111.

He did, however, attend the Board Meeting which made crystal clear again, what the technology was.  Dr. Sherer stressed, as he always had done, Defendant Emory's common interest and stake and commitment to the success of TCT, as both royalty holder and as Defendant Emory's department to aid Defendant Emory's affiliated startups.

112.

An executed May 7, 2009, "SECOND AMENDMENT TO THE RELEASE LETTER between EMORY UNIVERSITY and OMAR M. LATTOUF, M.D., PH.D."[6], which was signed by Dr. Sherer and Dr. Lattouf, explained that Emory and Dr. Lattouf wished to amend the Release Letter, as amended by the First Amendment, to replace the First Amendment

---

[6] (hereinafter "Second Amendment")

Improvements, with the following Improvements:

- U.S. Provisional Patent Application No, 60/365,918 titled "Off Pump Mitral Valve Repair Utilizing Endocardiac Stapling Device
- U.S. Provisional Patent Application No, 60/369,988 titled "Off Pump Mitral Valve Repair Utilizing Endocardiac Catheter-Based Stapling Device"
- U,S, Patent Application No. 10/313.198 titled "Treatments for a Patient with Congestive Heart Failure"
- U.S. Patent Application No. 10/295,390, titled "Treatments for a Patient with Congestive Heart Failure"
- Emory University Invention Disclosure No. 09097 entitled "Surgical Devices and Methods for Minimally Invasive Access and Treatment of Cardiac Complications"
- U.S. Utility Appl. No. 111698,643 entitled "Percutaneous Treatments for Heart Valves (Publication No. 20070265702) PCT Appl. No. PCTIUS2007/002191 entitled "Percutaneous Treatments for Heart Valves"
- European Patent Appl. No. 00762783.4 entitled "Percutaneous Treatments for Heart Valves"
- U.S. Utility Appl. No. 111784,385 entitled "Methods and Devices for Endocardiac Access" (Publication No. 20080004597)
- PCT Appl. No. PCT/US2008/004413 entitled "Methods and Devices for Endocardiac Access"
- U.S. Utility Appl. No. 11/784,681 entitled "Methods for Endocardial Ablation'' (Publication No. 20070270793)
- PCT Appl. No, PCT/US2008/04476 "Methods for Endocardial Ablation"
- U.S. Provisional Appl. No. 60/936,101 entitled "Shield for Protection of Esophagus during Ablation"
- U.S. Utility Appl. No. 12/141,633 entitled "Shield for Protection of Esophagus during Ablation"
- U.S. Provisional Appl. No. 60/958.482 entitled "Epicardium Payload Delivery Device''
- U.S. Provisional Appl. No. 60/997,417 entitled "Epicardium Payload Delivery Device"
- U.S. Provisional Appl. No. 611001,213 entitled ''Epicardium Payload Delivery Device"
- U.S. Utility Appl. No. 121168.743 entitled ''Epicardium Payload Delivery Device and Method"
- PCT Appl. No. PCTIUS2008/69355 entitled "Epicardium Payload Delivery Device and Method"
- U.S. Utility Appl. No. 11/006,967 entitled "Instrument Port" (Publication No. 20080249504)
- U.S. Provisional Appl. No. 611100,031 entitled "Methods for Minimally Invasive Cox Maze Ablation"
- U.S. Utility Appl. No. 12/006,967 entitled "Instrument Port"
- U.S. Provisional Appl. No. 61/062,375 entitled "Methods and Devices for

Mitral Valve Repair"

- U.S. Provisional Appl. No. 61/069,103 entitled "Aortic Port and Method for Intraoperative Angiography"
- U.S. Provisional Appl. No. 61/089,255 entitled "Artificial Heart Valve and Method of Deployment"
- U.S. Provisional Appl. No. 611087,457 entitled "Device and Method for Direct Heart Access"
- U.S. Provisional Application No. 61/150,602 entitled "Device and Method for Actively Dilating Organic Tissue"
- U.S. Provisional Application No. 611159,622 entitled "Device and Method for Vascular Tissue Closure''
- Issued patents disclosing and claiming only the intellectual property disclosed in the above-referenced patent applications, together with any and all extensions, divisionals, continuations, reexamined and reissued patents, and foreign counterparts of such patents which issue thereon.[7]

The Second Amendment is attached as Exhibit E.

113.

Focusing solely on the transapical method itself (and not other inventions), that method was shown from the outset of the earliest patents: a) Prov. App. # 60, 340,962, filed Dec. 8, 2001, contained one detailed drawing and it showed transapical access; b) Prov. App. #60,340,062, filed March 20, 2002, for Off Pump Mitral Valve contained a total of seven (7) illustrations, and all included transapical access and the written method of access (#1) included access "… through apex of left ventricle"; c) Prov. App. # 60,369,988 filed April 4, 2002, for Off Pump Mitral Valve Repair, showed a total of six (6) illustrations, and all included transpical access, and written methods of access (#1) included …"through the apex of the left ventricle." d) Patent US 6,978,176, issued Dec. 5 2005, shows twelve (12) illustrations of transapical access, and the second sentence of the abstract describes a valved passageway through the patient's left ventricle wall at the apex of the patient's heart….", and it was shown in all sequel applications.

114.

---

[7] These improvements will hereinafter be referred to as "Second Amendment Improvements".

Both the First Amendment and the Second Amendment release "any and all extensions, divisionals, continuations…" which covers "minimally invasive transapical access to the heart." *See* Exhibits C and E.  The IP which is the subject of the Release Letter and First and Second Amendment is sometimes herein called "the subject IP" or "Plaintiff's IP" or "the IP in question".

115.

Extensions, divisionals and continuations have been filed periodically whenever appropriate.  These were cited as examples in the letter to Emory of April 16, 2013 (*see* Exhibit F): a) US Utility App. No. 12/006,967 entitled "Instrument Port", filed January 8, 2008, is listed on page 4 (third listing down) of the Second Amendment.  This application was pending in January of 2011, and was still pending as of the date of that letter---with claims expressed one way before January of 2011 and a different way a year or so after; and b) it also referenced a March, 2013 patent application, succinctly described under type of invention, as "Methods and Devices for Minimally Invasive Transapical Access to the Heart", with excerpts attached.

116.

Dr. Lattouf invented the Second Amendment Improvements and they were his property as inventor, although the beneficial ownership of such assets and IP belonged to TCT, as licensee and assignee and provider of funds for patent applications, development efforts, and all expenses associated with the IP.

117.

All Defendants were informed of, and aware of, the ownership and beneficial interest of TransCardiac Therapeutics, LLC (the successor to TCT) in the IP from the outset of their involvement with the IP, except for Defendant Emory who was aware of it from and after its

28

formation and prior to its First Amendment to the Release letter.

118.

Dr. Lattouf has continuously confirmed the assignment of the Release Letter IP, the First Amendment Improvements and the Second Amendment Improvements to TCT.

119.

At all times relevant hereto, Defendants knew that the Release Letter IP, First Amendment Improvements and Second Amendment Improvements were not their inventions or their property.

120.

In November of 2010, AMV Partners, a third party prospective purchaser/licensee of TCT's technology, was making an offer that was preliminarily expressed as $45 million dollars plus a three (3) percent royalty for TCT's property.

121.

On Thursday, November 18, 2010 at 6:19 a.m., Dr. Lattouf wrote Defendant Emory:

Dear Sherer,

In accordance with my obligations toward the University as relates to the released IP pertaining to TransApical Access and Mitral Repair and associated technology, I am forwarding the attached offer from AMVP to your Office for your kind information and review.

Should you have any comments or concerns on behalf of the University, please advise in order for me to ensure that all the Rights of the University are appropriately documented and protected.

Respectfully,

Omar M Lattouf MD PHD

122.

That particular license (for terms sufficient to pay Defendant Emory its agreed upon royalty) as shown on the attachment was to encompass the following licensed field:

> ***Licensed Field:***   All markets in all fields of transapical left ventricular access and mitral valve assessment, repair or replacement, atrial fibrillation assessment and treatment, and CHF assessment and treatment, whether now known or hereafter existing.

Part of its (AMV Partners') PowerPoint presentation acknowledged:1) that TCT has "a number of patent applications -- including transapical access system; 2) that TCT has "trophy" assets meaning "an exit of $250MM must be possible"; 3) "Early Exit Potential -- exit for $225 MM and $225 earnout is likely"; and 4) "Next Steps: Goal –transaction financed with $5-6 MM in commitments by March 2011".

123.

A meeting occurred on November 30, 2010, between representatives of TCT and Defendant Emory, including Dr. Sherer and Dr. Suzanne Hollinger (Defendant Emory's in-house patent counsel), but at no time then or at any time previously or since has Defendant Emory advised TCT or Dr. Lattouf of any competing interest or any proprietary interest (separate from under TCT) in transapical minimally invasive intra heart repair.

124.

The exact same statement is true as for Defendants GTRC, GTF, Yoganathan and Thourani.  Namely, at no time then, or at any time previously or since has any of them advised TCT or Lattouf of any competing interest or any claim of proprietary interest in transapical minimally invasive intra heart repair.

125.

In the same timeframe, Dr. Lattouf emailed Defendant Yoganathan and others on October

8, 2010 regarding "Confidential VCs [Venture Capitalists] and TCT" as follows:

> Something is happening in the Mitral space that all of sudden, 3 separate groups, 2
> from California and another from Atlanta, have independent of one another
> approached me about a deal on my transapical access and mitral/chordal repair.   I
> wanted to give you a heads up in case you are contacted.  Please keep the identities
> of each of the VCs blinded from the other, as I am negotiating with each separately.
> I appreciate your help.

126.

Upon information and belief, Defendant Yoganathan, and likely all other

Defendants, were secretly negotiating their own arrangements for the startup, but

suppressed all information related to it.

127.

All material facts were suppressed and TCT was intentionally deceived and the property

wrongfully claimed.

128.

Beginning on or about January 10, 2011, all Defendants began false public statements

touting the individual Defendants as inventors and all Defendants as owners of certain Release

Letter IP, First Amendment Improvements and/or Second Amendment Improvements, including

in multiple press releases and articles posted online.

129.

Indeed, a February 10, 2011 online news article, which is actually a press release from

GT   Research   News   found   at   http://innovate.gatech.edu/healthcare/georgia-tech-emory-

university-startup-apica-cardiovascular-receives-51-million-investment-improved-heart-surgery-

system/ explains that "[a] Georgia Tech and Emory University medical device startup", which

was co-founded by Defendants Yoganathan, Jiminez, Thourani and one other, "has developed a system to simplify and standardize the technique for opening and closing the beating heart during cardiac surgery has received a $5.1 million investment."

130.

Several news articles originated as press releases from Defendant Emory and Georgia Tech, respectively, which falsely and willfully said that the Defendants had invented what Dr. Lattouf invented and TCT owned, "transapical open and closure procedure" with "conduit" for access to "beating heart", as "new minimally invasive procedure".

131.

These articles and press releases included statements which falsely claimed invention of the IP and ownership of it, and falsely expressed or implied the right of Defendant Emory and Georgia Tech or its affiliates to license the IP in question, revealed the Defendants and the startup to profit from it,  denigrated TCT's proprietary information, and infringed on Plaintiff's right to publicize its ownership of the invention and proprietary information, and depreciated the value of TCT's personal property and work, and confused, if not destroyed, the market for the IP in question, created immense damage to Plaintiff; and set in motion activities and plans to complete and maximize that destruction; all willfully with full knowledge of TCT's proprietary rights  and based upon their confidential receipt of this information from TCT.

132.

The system referenced in the article is Dr. Lattouf's invention and TCT's property.  Per the express or implied terms of the false press releases, the defendants have a beneficial and/or financial interest in the startup company.

133.

These press releases and articles are using terms that are extraordinary for Emory, and upon information and belief, Defendant GTRC and Defendant GTF also, because the Defendant Emory Intellectual Property policy defines the words used in these press releases, and make clear that the use of Defendant Emory's name in any commercial setting requires the approval of certain officer and house counsel (policy 7.6.09). Similarly, the term "Emory Startup" is limited to licenses from Defendant Emory (not releases of IP to faculty and their startup ventures for Defendant Emory's benefit), and "Founder" may be Emory Personnel subject to the provisions of Emory's Conflict of Interest Policy. This means that Defendant Emory and Defendant GTRC were heavily involved in the planning and the activities resulting in the breaches of laws and integrity herein alleged, which include their decisions to promote the actions via special designations, and later awards, and via public relations campaigns.

134.

Looking back now, the startup company, Apica Cardiovascular Technologies, Inc. ("Apica"), was formed in Georgia on November 24, 2009, and two startup companies with substantially the same name were formed in Ireland on October 22, 2010, but the announced transaction/startup touted in the press releases based upon alleged licenses from Defendant Emory and Defendant GTRCis believed to have occurred on an unknown date in January of 2011. Upon information and belief, Defendant Emory was involved in negotiations and actions relative to the startup company at or near the same time that it was reviewing the AMVPartners proposal to TCT, and breaching legal duties by both silence and participation in wrongful acts.

135.

After learning of the startup company by Defendant Emory, in his first meeting with Dr.

Sherer, Dr. Lattouf inquired of Dr. Sherer as to how could he facilitate Apica and make the false statements when he knew that Transapical Access was Dr. Lattouf's invention and assigned and owned by TCT, and as reflected by years of promotion and interest chronicled somewhat herein.

136.

Dr. Sherer denied knowledge and any recollection as to Dr. Lattouf's invention and TCT's property.

137.

In fact, not only did Dr. Sherer know well from the prior encounters and contracts chronicled herein, but Defendant Emory's house counsel also knew also, having cited it as a "suitable transapical valve conduit" in one unrelated patent application (Pub. No. US 2010/0087907A1.filed February 15, 2008).   The patent referenced is expressly referenced in the US and International Patent registry as "Trans Apical Port."

138.

Dr. Sherer brought the matter to the attention of the General Counsel of Defendant Emory (Chris Kellner), who along with Dr. Sherer, participated in a conference call with Dr. Lattouf on June 26, 2012, in which the rights of TCT and the invention of Dr. Lattouf were again not recognized (and denied throughout, without interest in examination of facts).

139.

During that call, the General Counsel of Defendant Emory asked whether a multi-million dollar lawsuit was being prepared against Defendant Emory, and Dr. Lattouf responded that he would like for the matter to be worked out with Defendant Emory.

140.

A follow-up meeting was scheduled for July 17, 2012, to which TCT brought Mike

Bowers as counsel, but in this meeting the principal speaker was Mr. Kellner, and the rights of

TCT and the invention of Dr. Lattouf were denied throughout and not recognized (again without

any interest in, or evidence of, examination of facts by Emory or its General Counsel). In

addition to being supportive of Emory's Office of Technology Transfer without knowledge of

the facts, the General Counsel disregarded the truth and even mocked Dr. Lattouf, accusing him

of being jealous of Defendant Thourani's invention (which was Lattouf's invention and property

of TCT).   Defendant Emory steadfastly refused to communicate substantively, and refused to

disclose requested facts.   Defendant Emory continued to feign ignorance and lack of

understanding and responsibility through Dr. Sherer's response of October 17, 2013, which was

in response to Dr. Lattouf's email of October 2, 2012.   Both are attached as <u>Exhibit F</u>.

141.

Intellectual property invented and developed a university is designed to be fully protected

from others therein, including fellow faculty and students, which ensures an IP-fostering

environment.   The Venture Labs and testing facilities for public visitors to Georgia Tech and its

affiliates (Defendants GTRC and GTF) are supposed to operate in the same way.

142.

The rules and regulations of Defendant Emory and Georgia Tech and its affiliates, as well

as The Board of Regents of the University System of Georgia ("Board of Regents"), which

governs Georgia Tech and its affiliates (pursuant to authority granted by O.C.G.A. § 20-3-51),

requires honor and respect for the intellectual property of others, including faculty and students,

without any plagiarism, dishonesty (such as false claims of invention of, and title to, the

invention of another faculty member) or misconduct, and require disclosure and reporting of

conflicts of interest.

143.

Defendant Emory Intellectual Property Policy 7.6.04, states in part: "[n]o release or assignment of Intellectual Property will be granted where that release or assignment is inconsistent with the rights granted to a third party." That statement is consistent with applicable law, and all defendants violated both this policy, which is binding on all, and the applicable law to the same effect.

144.

Defendant Emory Intellectual Property Policy, per 7.6.02, applies to all Defendant Emory Personnel (including visitors and students). Unless released (as was done for the IP of Plaintiff), Emory owns all intellectual property (7.6.01).

145.

The Defendant institutions reportedly discuss their supposed commitment to integrity, such as when Defendant GTRC speaks of "uncompromising integrity" in its website.

146.

The Board of Regents Code of Conduct states: "[w]e will….VII. Respect the intellectual property rights of others." …11. "Disclose and avoid improper conflicts of interests."

147.

Defendant Emory's policies (such as the 4.62 Standards of Conduct) require: "high standards of conduct and performance" and the "[a]pplication of uniform and consistent standards[.]"

148.

Defendant Emory denounces: "[m]isuse, defacement or destruction of Emory, student, employee, patient, or visitor property" as well as "[t]heft or unauthorized possession, removal,

destruction, or use of property belonging to Emory or a student, employee, patient, or visitor."

149.

Defendant Emory requires, under Section 4.87, that its employees: "avoid any business or financial relationship, transaction or event that may be viewed, internally or externally, as a conflict of interest between an employee and an outside party."

150.

Defendant Emory has adopted an overarching Statement of Guiding Ethical Principles that applies to Defendant Emory employees and all other members of the Defendant Emory Community, and which states that:

> ….. Members of Emory are expected to strive for the **highest degree of integrity. ….** All **conflicts of interest and of commitment are to be promptly addressed**, and all possible steps are to be taken to eliminate the conflicts or to manage them to ensure that they do not undermine the integrity of our institution or ourselves. Emory seeks to uphold the **dignity** and **rights** of all persons through **fair treatment**, **honest dealing**, and **respect**. ….

> By our participation in the Emory community, each of us assumes **responsibility** for our actions and will be held **accountable** for them.

(Emphasis added).

151.

By law, and upon information and belief, by policy represented to be call the Joint Master Policy incident to joint programs between Defendant Emory and Georgia Tech, Georgia Tech and its affiliates (including Defendants GTRC and GTF) are required to honor and respect the Intellectual Property of Defendant Emory, which extends to intellectual property in which it retains a royalty interest and which it has released.   Moreover, this requirement is consistent with the Honor code for Georgia Tech (the Board of Regents Code of Conduct) which requires all to respect the intellectual property of others.

152.

The rules and regulations of Defendant Emory and Georgia Tech and its affiliates regarding integrity and protection of interests of others in IP overlap with, and are consistent with public duties, and the private legal rights incident to confidential relationships (including those referenced in O.C.G.A. § 51-1-1 and O.C.G.A. § 23-2-58), and may also be considered private duties, which accompanied by damage, give a cause of action pursuant to O.C.G.A. § 51-1-8.

153.

According to Defendant Emory's current website for Faculty and Start-up Services, Defendant Emory "integrates the Georgia Research Alliance (GRA)'s VentureLab Program with OTT operations in an attempt to complement existing services provided to faculty and to augment start-up development."

154.

No claim of co-ownership or co-inventorship has ever been received from any of the Defendants.

155.

No notice has been received that they were competitors or planned to appropriate Plaintiffs' property.

156.

Neither Defendant Yoganathan nor Defendant Thourani resigned from the Scientific Advisory Board of TCT.

157.

In late 2012, Plaintiff discovered that the Defendants' new "startup" is touted on Georgia

Tech's Venture Lab site as worthy of additional investment and reveals that the Georgia Research Alliance has invested $389,000 in it. Its Venture Lab site also describes Jimenez's Transapical Heart System, which also describes TCT's proprietary and confidential information, as worthy of investment or sale, and states that the Georgia Research Alliance has invested $25,000 in it. Both of these notices state that the associated faculty member is Defendant Yoganathan.

158.

Contrary to their promotions, these inventions are Plaintiff's, which were entrusted in confidence and based on assurance of total protection from Georgia Tech's affiliates, and that these same parties purported to represent Plaintiff in a previous application for investment from Georgia Research Alliance, but nothing was forthcoming.

159.

For the express benefit of TCT, and in order to present to the Defendants the facts of the breaches of duties and integrity and in order to provide the Defendants with an opportunity for response and correction and to demand disclosures and relief, Dr. Lattouf presented the history of breaches of duties to all defendants (except Defendant Jimenez who was from the outset an assistant for Defendant Yoganathan) in a 27-page letter with exhibits (*see* Exhibit G). Indeed, despite Defendant Emory's false claims of ignorance, such a long letter with detailed exhibits was the message of Dr. Sherer's email of October 17, 2012, which requested more information.

160.

No substantive response was received from any Defendant.

161.

Defendant GTRC, by short correspondence, said that the $10,000 check for work for hire

came from Emory (which was disbursing per Dr. Lattouf's instructions), but there has been no subsequent response.

162.

After approximately 70 days, Defendant Emory sent a three-page request for more information, and Dr. Lattouf sent a sequel 16-page letter, dated April 16, 2013, with more information and more demands for disclosure. Again, no response was received.

163.

Defendant Emory, and to best of Plaintiff's knowledge, Defendants GTRC and GTF have profited immensely from assignments of technology in recent years. As is evident from public records, this revenue well exceeded $ 1 billion dollars for Defendant Emory, and likely exceeded $2 billion during the last ten years.

164.

As shown by the facts of this case, the character of Defendant Emory and Defendants GTRC and GTF, as affiliates of Georgia Tech, has changed such that the power of money from technology is greater than the adherence to their professed integrity and ethical values.

165.

In this case, Defendant Emory released all improvements, continuations and divisionals to the IP and acknowledges Plaintiff as the owner thereof, but Defendant Emory's actions indicate that it would not do so today (even if it were honoring its prior commitments which it is not). The breaches of integrity and law described herein are willful and ratified and often, if not always, made with in-house legal counsel that serves the new character.

166.

Subsequent to January of 2011, upon information and belief, all Defendants have

40

operated to promote their startup company as the false inventor and/or owner of the IP in question, which include an article to promote the products of the startup by Defendant Thourani, and others published in Ann. Thorac. Surg. 2012,-94:1706-9 (http://dx.org/10.1016/j.athoracsur.2012.08.102; b)

167.

Defendant Emory not only names the startup as its company of the year for 2010, during 2011. Thereafter, such as during the Defendant Emory OTT Breakfast Club meeting of December 13, 2011, the startup is again featured, with others, as having an "Apical Port Access System" but Plaintiff and Dr. Lattouf are not mentioned.

168.

In willfully breaching its contracts and falsely recognizing Defendants Thourani, Yoganathan and Jimenez as inventors of the technology, Defendant Emory benefited by being able to falsely claim much larger interests, up to 100% ownership (rather than its 2% royalty under TCT), minus the percentage allocated for Defendant GTRC. So by wrongful acts, it was able to claim significant, likely dominant, ownership of the technology it had long coveted, which was owned by TCT (and invented by Dr. Lattouf).

169.

The facts demonstrate an orchestrated refusal to speak by all Defendants in circumstances where all have had duties to speak and duties to disclose for years and continually, and this evolved into a refusal to respond. Despite intimate knowledge and confidential relations, and despite the orchestrated willful breach of legal duties by all defendants, and despite presentation of the claims in detail with exhibits, all have refused to speak or even disclose the facts related to their start up transaction and alleged licenses, and all have refused to present any alleged defense

41

or justification, which is egregious bad faith and proof of conspiracy to defraud and breach legal duties. This long-term bad faith taints the entire circumstances and reflects joint refusal to speak until a "spun" defense is required in response to litigation and it reflects the surreptitious development of that "spun" defense during successive breaches of that duty. Defendant Emory has done this in person and in refusal to respond substantively to written notice of claims. No response whatsoever was received from Defendant Yoganathan or Defendant Thourani. No substantive response was received from Defendant GTRC or Defendant GTF despite detailed notice, including that its institutions and faculty are involved as are false claims in the Venture Labs.

170.

Beyond disdain and lack of interest in truth and law, these facts reflect a belief by the defendants that they are above the law, and a belief by the Defendants that they are above their own rules.

171.

A plan to suppress communication when there is a duty to speak and disclose is illegal and fraudulent. Properly, the law presumes the truth of the presented charges, when a response is not forthcoming within a reasonable time.

172.

As Exhibit G, Plaintiff incorporates the letters written for its benefit and the few non-substantive responses. Such letters substantially detail the same claims as presented herein.

173.

Plaintiff shows that Defendants' failure to respond the letters written for Plaintiff's benefit, as a matter of law, invokes the presumption of O.C.G.A. § 24-14-23, so that all

Defendants (other than Defendant Jimenez, who was not an addressee) shall be presumed to admit the truth of the statements in the letter and to adopt them. Plaintiff shows that that other statutes are also applicable to similar effect: O.C.G.A. § 24-14-28 would prevent representatives (such as the Defendants) with custody of papers to discover defects in title to property in their care and shall be estopped from setting up title adverse to the trust; and O.C.G.A. § 24-14-29 defines circumstances for application of equitable estoppel to where another has been misled to its injury by some intended deception in the conduct or declarations of the party to be estopped, such as gross negligence or constructive fraud. All of these principles support a presumption as a matter of law and fact that the Defendants breached their duties to Plaintiff.

174.

This is a unique case where Defendants have deviated from normal integrity and decency and hope to use the judicial system as a club; when they failed and refused to speak and communicate through years of duties and overtures, and obvious illegal secret planning to violate the spirit and letter of the law to accomplish their goal, while allegedly dodging partially their duty not to contest their principal's title (although false claim of invention and ownership does so).

175.

Upon information and belief, the Defendants' plan from the outset was to capture Plaintiff's trophy IP illegally and oppress Plaintiff with its large economic resources and bogus hidden defenses into a modest settlement; while continuing to deceive the administrations of the academic institutions.

COUNT I: BREACH OF CONTRACT (RELEASE LETTER AND AMENDMENTS) AND LEGAL DUTIES DUE
TO CONTRACT
(AS TO EMORY, YOGANATHAN AND THOURANI DEFENDANTS)

176.

The allegations of all paragraphs above Count I are incorporated herein by reference as if
fully set forth.

177.

The Release Letter and its amendments (*see* Exhibits A, C and E) are contracts in that
they regard the subject matter of the Release Letter IP and the First and Second Amendment
Improvements, include the consideration that Defendant Emory will receive a percentage of Net
Sales of any product sold by Dr. Lattouf or his assignee, which would include TCT, and are
based on mutual assent in that they are signed by Dr. Lattouf and Defendant Emory.

178.

Defendant Emory is an entity and, therefore, acts through its employees and agents,
including Defendants Yoganathan, and Thourani.

179.

Defendants Yoganathan and Thourani and, therefore, Defendant Emory (by agent and
independent actions) breached the Release Letter and its amendments by publicly representing
that certain of the Release Letter IP and First and Second Amendment Improvements were their
inventions and/or their own, when the Release Letter and its amendments assign Defendant
Emory's ownership rights and interest to Dr. Lattouf, who has assigned the same to TCT.

180.

Defendants Emory, Yoganathan and Thourani breached the Release Letter and the First
and Second Amendments by claim of invention and ownership of the IP and alleged assignment

44

to their start up entity, by their respective roles of participation in the plan of breach of that contract.

181.

Defendant Emory breached the terms of the written contract evidenced by the Release Letter and First and Second Amendments, including the duties of good faith and fair dealing incorporated by law therein, and its own Policy 7.6.04 by granting rights inconsistent with those previously granted to, and held by, TCT.

182.

As a result of Defendants Emory's, Youganathan's and Thourani's breaches of the Release Letter and its amendments, TCT has been damaged in an amount in excess of TEN THOUSAND DOLLARS ($10,000).

COUNT II: BREACH OF ORAL CONTRACT AND DUTY
(AS TO DEFENDANTS YOGANATHAN, JIMINEZ, THOURANI, GTRC AND GTF)

183.

The allegations of all paragraphs above Count I are incorporated herein by reference as if fully set forth.

184.

Dr. Lattouf, on behalf of TCT, orally contracted with Defendants Yoganathan, Jiminez, Thourani, GTRC and GTF, all of whom agreed that Defendants Yoganathan, Jiminez, Thourani, GTRC, and GTF would keep information shared with them regarding the Release Letter IP and subsequent improvements confidential and not use such IP and improvements for their own benefit in performing building, testing and research of Dr. Lattouf's inventions for the consideration of $10,000, which Dr. Lattouf paid to Defendant GTF.

185.

This promise is the same as the duty of integrity owed by such Defendants under the rules of integrity promulgated by the Board of Regents for Georgia Tech and all of its affiliates, which is pursuant to statutory authority from the Georgia legislature for management, and should be enforced independent of, and overlapping with, the promise as equivalent of Georgia law.

186.

Defendant Emory has identical duties of integrity, which should also be enforced as against dual employee and faculty member, Defendant Yoganathan, and Defendant Emory employee and faculty member, Defendant Thourani.

187.

Defendants Yoganathan, Jiminez, Thourani, GTRC and GTF breached their oral contract with Dr. Lattouf for Plaintiff by sharing and using to their own benefit the Plaintiff's property including Plaintiff's IP.

188.

As a result of Defendants GTRC, GTF, Yoganathan, Jiminez and Thourani's breach of their oral contracts, TCT has been damaged in an amount in excess of TEN THOUSAND DOLLARS ($10,000).

## COUNT III: BREACH OF DUTY OF CONFIDENTIAL RELATIONS
### (AS TO ALL DEFENDANTS)

189.

The allegations of all paragraphs above Count I are incorporated herein by reference as if fully set forth.

190.

As described in Counts I through XI, which are incorporated herein by reference as if

46

fully set forth, TCT had a confidential relationship with each Defendant regarding the Release Letter IP and First and Second Amendment Improvements either by written or oral contract and duties arising by relationships and/or laws.

191.

Moreover, Defendants were each, by nature of the information obtained from Dr. Lattouf on behalf of TCT related to the Release Letter IP and First and Second Amendment Improvements, so situated as to exercise a controlling influence over the will, conduct, and interest of TCT.

192.

Further, Defendants were each by nature of the information shared by Dr. Lattouf on behalf of TCT regarding the Release Letter IP and First and Second Amendment Improvements, in a relationship of mutual confidence.

193.

Defendants' relationships with TCT regarding the Release Letter IP and First and Second Amendment Improvements through Dr. Lattouf, were such that they required the utmost good faith.

194.

Defendants, and each of them, therefore, had a both a confidential relationship and a fiduciary relationship with TCT regarding the Release Letter IP and First and Second Amendment Improvements.

195.

Defendants, and each of them, breached their confidential relationship to TCT by surreptitiously planning for and announcing false claims of invention and assignment and

antagonistic rights in the Release Letter IP and First and Second Amendment Improvements.

### 196.

As a result of Defendants' breach of their fiduciary duty to TCT, TCT has been damaged in an amount in excess of TEN THOUSAND DOLLARS ($10,000).

### COUNT IV: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (AS TO ALL DEFENDANTS)

### 197.

The allegations of all paragraphs above Count I are incorporated herein by reference as if fully set forth.

### 198.

Defendants, and each of them, purposefully, with malice and intent to injure TCT, wrongfully publicly represented that they invented certain of the Release Letter IP, First Amendment Improvements and/or Second Amendment Improvements.

### 199.

Defendants' wrongful representations have caused third parties to fail to enter into anticipated business relationships with TCT and, instead, to enter business relationships with Defendants.

### 200.

Defendants' aforementioned tortious conduct has caused TCT damage in an amount in excess of TEN THOUSAND DOLLARS ($10,000) and constitutes tortious interferences with TCT's business relations.

<u>COUNT V.  TORTIOUS INTERFERENCE WITH DEFENDANT EMORY CONTRACT</u>
(AS TO ALL DEFENDANTS EXCEPT DEFENDANT EMORY)

201.

All Defendants, except Defendant Emory (which directly breached its contracts), tortiously, purposefully and with intent to harm Plaintiff and enrich themselves at Plaintiff's expense, interfered with Plaintiff's contractual rights with Defendant Emory.

202.

All Defendants were informed and knew that the IP in question had been released and assigned by Defendant Emory to Plaintiff.

203.

All Defendants maliciously and with the intent to cause the result of interference with Plaintiff's interests in the contracts with Defendant Emory which released the IP and all continuations, divisionals, and extensions thereof; and to claim wrongfully the benefits of the contracts and their subject matter.

204.

All Defendants acted together to cause the interference and the damage, if not destruction to Plaintiff's personal property, and the acts of the Defendants were wrongful and in breach of applicable laws and duties and the relationships with Plaintiff.

205.

Upon information and belief, these acts included, among others: knowingly persuading Emory to breach the known contract, knowingly persuading Defendant Emory that they or some of them invented the IP; knowingly persuading Defendant Emory that it owned the IP, knowingly encouraging business ventures which frustrated, if not destroyed, the value of Plaintiff's contracts, and damaged, if not destroyed, the IP which is the subject of Plaintiff's

49

contracts; and knowingly misused confidential information.

206.

Defendants' aforementioned tortious conduct has caused TCT damage in an amount in excess of TEN THOUSAND DOLLARS ($10,000) and constitutes tortious interferences with TCT's business relations

COUNT VI: BREACH OF LEGAL DUTIES AND CONTRACT
(AS TO ALL DEFENDANTS)

207.

The allegations of all paragraphs above Count I are incorporated herein by reference as if fully set forth.

208.

All individual Defendants were agents of Plaintiff, including Defendants Yoganathan and Thourani as members of the SAB, and Defendants Yoganathan and Jimenez as work-for-hire, and all as fellow faculty under policies of protection of property of other faculty, and Defendant Emory was a form of agent as one who had surrendered title and committed to a role of support; and Defendants GTRC and GTF as work-for-hire or agents of work-for-hire (with them working in tandem to accomplish their agreed task).

209.

Defendants breached their duties required by law and statutes, independent of their duties required by their contracts or contractual relationships, which duties overlap and include but are not limited to:

1.    Duty not to profit from principal's property (O.C.G.A. § 10-6-25);

2.    Duty not to dispute Principal's Title (by falsely claiming invention and ownership) (O.C.G.A. § 10-6-26);

50

3.      Duty not to mingle with property of others (O.C.G.A. § 10-2-29);

4.      Duty not to confuse with property of others (O.C.G.A. § 23-2-4);

5.      Duty not to acquire antagonistic rights (O.C.G.A. § 23-2-59);

6.      Duty to respect the honor code of Defendants GTRC and GTF, promulgated by the Board of Regents by as law, and duty to honor the honor code of Defendant Emory as equivalent of law;

7.      Duty not to falsely claim invention and ownership in violation of duties as members of TCT's SAB;

8.      Duty by law to perform an act for the benefit of another or refrain from an act which may injure another (O.C.G.A. § 51-1-6); and

9.      Duty to honor private duties arising from statute or relations created by contract express or implied (O.C.G.A. § 51-1-8) -- inclusive, without limitation, of rules and regulations of Defendant Emory and Georgia Tech and its affiliates (including Defendants GTRC and GTF) to respect the IP of others, disclose and avoid conflicts of interest, and not to plagiarize the work of others.

210.

Defendants Yoganathan and Thourani breached their legal duties, express or implied, as members of the SAB, under original and continuing undertakings by oral promises, as well as written expressions there, as well as duties imposed by law, by falsely claiming invention and ownership of the IP of Plaintiff, which they acknowledged as owned by Plaintiff and their role as agents for benefit of Plaintiff.    Defendant Thourani also breached his legal duties by surreptitiously joining the SAB of competitor MitralSolutions.

211.

As a result of all Defendants' breach of their legal duties, and Defendants Yoganathan and Thourani's breach of their respective SABAs, TCT has been damaged in an amount in excess of TEN THOUSAND DOLLARS ($10,000).

<u>COUNT VII: FRAUD</u>
<u>(AS TO ALL DEFENDANTS)</u>

212.

The allegations of all foregoing paragraphs are incorporated herein by reference as if fully set forth.

213.

The promise of Georgia Tech for itself and its affiliates, Defendants GTRC and GTF, to protect the proprietary and confidential information of Dr. Lattouf and TCT was a misrepresentation, which was relied upon by Dr. Lattouf and TCT.

214.

Georgia Tech and its affiliates (including Defendants GTRC and GTF) fraudulently and willfully breached by its actions, and by its sale to the startup associated with the Defendants and by false press releases and by false continuing statements of rightful ownership via Venture Lab ads, and via their representatives Defendants Yoganathan and Jimenez, when all such representations and statements were completely false and fraudulent.

215.

This fraud extends to Defendant Emory by virtue of 1) Defendant Yoganathan being a joint GT/Defendant Emory faculty member; and 2) by the evidence that Defendant Emory intended to evade, and evaded, its obligations under its Release Letter as amended by First and Second Amendments via assignments and releases of information; and its bad faith in refusing to

52

honor its duties to speak (and investigate and verify the truth of Plaintiff's claim), including without limitation, in refusing to honor multiple repeated requests for full information when no other person or entity has greater legitimate interest in, and need for, such full information.

216.

Defendants GTRC and GTF's facts include the aforesaid suppression of evidence, as well as their failure to honor their promise and failure to produce any non-disclosure agreement timely, forthrightly or which matched their promise, and their failure and refusal to honor their duties to speak (and investigate and verify the truth of Plaintiff's claim), including their failure and refusal to treat seriously the claims presented by long letter with documentation; and their desire to treat the fact that Defendant Emory wrote the $10,000 check (even with proof that it was from Dr. Lattouf's discretionary fund) as a reason to look no further, and not respond substantively, including to charges of false claims of ownership resulting from paid testing services, and even claims of ownership on state funded Venture Labs; all of which supports their willful intent to defraud Plaintiff.

217.

Defendant further Emory committed fraud in the inducement by confirming for TCT and its existing and prospective investors that Emory had carefully reviewed the propriety of the first release of technology and the prospective second release of technology for any opportunity for "a second bite of the apple", and by executing the second release effectively affirmed that the technology belonged to TCT, free of claims of Emory, and thereafter TCT raised the bulk of the monies invested in TCT in reliance thereon.

218.

But later Defendant Emory suppressed its plans and acts to claim the IP in question.

53

219.

Defendant Emory further committed fraud by making the false representation that it was a committed stakeholder in the success of TCT, and then later surreptitiously making false public statements of its ownership and assignment to its startup.

220.

A notable interim step -- which evinced Emory's envy, interest and design to re-acquire TCT's technology -- was taken with the formation of the ValveCo plan and proposal in late 2005 and early 2006.

221.

As fraud in violation of Georgia law (including O.C.G.A. § 23-2-52 and § 23-2-53), Emory suppressed all material facts concerning its secret plan to claim ownership and compete from its planning through its implementation and even to date in terms of failure and refusal to disclose the truth underlying its brazen civil theft by deception.

222.

All Defendants committed fraud by suppressing: their individual and collective intent to compete and profit from  false claims of invention of transapical minimally invasive surgery by certain of the defendants (Defendants Yoganathan, Thourani, and Jimenez), and to claim title to that invention, and to support the acts and public statements of Defendant Emory and Defendant GTRC of their alleged right to license, and act of licensing, such alleged invention to a new entity in which, or under which, all defendants held interests or received or anticipated economic rewards.

223.

Defendant Emory knew from its prior dealings with Dr. Lattouf and TCT that TCT's IP

was "trophy" and that it included transapical access systems.

224.

The written PowerPoint offer proposal from AMVPartners expressly recognized Plaintiff's "trophy' IP and its applications for transapical access systems.

225.

Defendant Emory remained silent and suppressed the information that it was conspiring to wrongfully sell TCT's personally property to a startup that involved all Defendants.

226.

All Defendants conspired to breach contracts and legal duties to TCT both during times unknown to Plaintiff but including the same time that AMVPartners was recognizing TCT's trophy assets including patent application for transapical system, while keeping silent when they had duties to speak and to avoid disclosing the actions that they had taken.

227.

Defendants and each of them, willfully and with an intent to deceive and/or recklessly without knowledge, falsely represented to Dr. Lattouf, who was acting on behalf of TCT, that if he shared with them information regarding the Release Letter IP and First and Second Amendment Improvements, they would keep it confidential and not use it for their own benefit.

228.

Dr. Lattouf, on behalf of TCT, innocently and justifiably relied and acted upon Defendants' false representations of material facts and shared certain information with Defendants regarding the Release Letter IP, First Amendment Improvements and/or Second Amendment Improvements to TCT's detriment.

229.

All Defendants suppressed material evidence of their desire to falsely claim invention, of their desire to falsely claim ownership, of their desire to compete with TCT and indeed even attempt to destroy or damage immensely its market and its personal property, of their desire to coordinate suppression of their plan from Dr. Lattouf and TCT; and of their desire to use their economic clout to force the institutions to commit egregious breaches of duty and integrity..

230.

Defendants also committed fraud by using the information regarding the Release Letter IP and First and Second Amendment Improvements, which they falsely represented they would not use for their own benefit, for their own benefit by representing such information as their own inventions and property.

231.

All Defendants conspired together to suppress information from Dr. Lattouf and TCT regarding TCT's property.

232.

All Defendants, instead of honoring the interests of TCT and instead of fulfilling their duty to speak, suppressed their wrongful claims and plans to facilitate the arrogation of same by a startup in which they held an interest; and severely damage, if not destroy, the Plaintiff's personal property and its market, including the interest and opportunity of AMVPartners and the interest and opportunity taken by the Defendants through their startup.

233.

Such suppression was fraud.

234.

56

The damage to TCT's personal property resulted from the wrongful claims and the unlawful arrogation of the principal's (TCT's) property, and the acquisition of complete antagonistic rights by persons and entities in confidential relations, and the civil equivalent of theft by deception. The Defendants depreciated the value of TCT's personal property and work, and confused, if not destroyed, the market for the IP in question, created immense damage to Plaintiff; and set in motion activities and plans to complete destruction; all willfully with full knowledge of TCT's proprietary rights and based upon their confidential receipt of this information from TCT.

235.

As a result of Defendants' fraud, TCT has been damaged in an amount in excess of TEN THOUSAND DOLLARS ($10,000).

COUNT VIII: CONSPIRACY
(AS TO ALL DEFENDANTS)

236.

The allegations of all paragraphs above Count I are incorporated herein by reference as if fully set forth.

237.

Defendants acted in concert to accomplish the unlawful end of representing certain of the Release Letter IP, First Amendment Improvements and Second Amendment Improvements as their own.

238.

Indeed, Defendants combined together to tortiously interfere in TCT's business relations as described above and to commit fraud as described above and to breach their legal duties as described above, which Counts are incorporated herein by reference as if fully set forth.

239.

Defendants' concerted unlawful tortious and fraudulent actions equal civil conspiracy and have damaged TCT in an amount in excess of TEN THOUSAND DOLLARS ($10,000).

<u>COUNT IX: FALSE ADVERTISING</u>
<u>(AS TO ALL DEFENDANTS)</u>

240.

The allegations of all paragraphs above Count I are incorporated herein by reference as if fully set forth.

241.

As described in Count I, which is incorporated herein by reference as if fully set forth, Defendants fraudulently represented that they invented and/or own certain of the Release Letter IP, the First Amendment Improvements and/or the Second Amendment Improvements.

242.

Defendants and each of them, with the intent to directly or indirectly dispose of certain of the Release Letter IP, the First Amendment Improvements and/or the Second Amendment Improvements, made and disseminated and/or caused to be made and disseminated before the public of Georgia through at least online news media that they own and/or invented the Release Letter IP, the First Amendment Improvements and/or the Second Amendment Improvements, which statements are untrue and as well as fraudulent.

243.

Defendants' acts of disseminating untrue and fraudulent information have aggrieved TCT by causing it damage in an amount in excess of TEN THOUSAND DOLLARS ($10,000) and amount to false advertising.

244.

Therefore, TCT requests that Defendants be fined as required by law.

## COUNT X: EXPENSES OF LITIGATION (PURSUANT TO O.C.G.A. § 13-6-11)
### (AGAINST ALL DEFENDANTS)

245.

The allegations of all paragraphs above Count I are incorporated herein by reference as if fully set forth.

246.

Dr. Lattouf, on behalf of TCT, has attempted to communicate with Defendants to resolve the issues in this Complaint in advance of filing this lawsuit. *See* Exhibit F.

247.

Defendants have acted in bad faith, have been stubbornly litigious and have caused TCT the unnecessary trouble and expense of this litigation.

248.

As such, Defendants owe TCT the expenses of this litigation.

## COUNT XI: PUNITIVE DAMAGES
### (Against All Defendants)

249.

The allegations of all paragraphs above Count I are incorporated herein by reference as if fully set forth.

250.

The actions and omissions described constitute clear and convincing evidence of willful misconduct, malice, fraud, wantonness, oppression, and the entire want of care which would raise the presumption of conscious indifference to the consequences by all Defendants, thereby

warranting an award of punitive damages.

251.

Plaintiff brings this Count to recover punitive damages in such amount as a jury determines from the evidence is authorized to deter such conduct in the future.  Specifically, Plaintiff seeks punitive damages to remedy Defendants' conduct remediable at law with punitive damages, including but not limited to that referenced in the Counts regarding tortious interference with business relations, tortious interference with contract and fraud above.

**PRAYER FOR RELIEF**

**WHEREFORE** TCT requests the following relief:

i.    Judgment in TCT's favor and against Defendants in an amount in excess of TEN THOUSAND DOLLARS ($10,000) to be determined by the enlightened conscious of an unbiased jury;

ii.    Interest, penalties and fines permitted under the law;

iii.    Expenses of this litigation pursuant to O.C.G.A.§ 13-6-11;

iv.    Judgment in such amount of punitive damages as the jury determines from the evidence with deter such conduct in the future;

v.    Other relief permitted by law; and

vi.    Any relief this Court deems just and proper.

Respectfully submitted,

      /s/ *John W. Crongeyer*
John W. Crongeyer, M.D.
Georgia Bar No. 197267

CRONGEYER LAW FIRM, P.C.
2170 Defoor Hills Road
Atlanta, GA 30318
(404) 542-6205
jwc@birdlawgroup.com

*Signatures continue on the following page*

60

_/s/ William Q. Bird_
William Q. Bird
Georgia State Bar No. 057900
Kristen L. Beightol
Georgia Bar No. 425814

BIRD LAW GROUP, P.C.
2170 Defoor Hills Road
Atlanta, Georgia  30318
(404) 873-4696
wqb@birdlawgroup.com
klb@birdlawgroup.com

_/s/ J. Robert Howard_
J. Robert Howard
Georgia State Bar No. 370900

2393 Montview Drive, N.W.
Atlanta, Georgia  30305
(404) 367-9924
Jrh2393@comcast.net

**_Attorneys for Plaintiff_**

61

State Court of Fulton County
***FILED***
File & ServeXpress
Transaction ID: 53613255
Date: Aug 09 2013 01:17PM
Cicely Barber, Clerk
Civil Division

# General Civil Case Filing Information Form (Non-Domestic)

**Court**        **County**  __Fulton__        **Date Filed**  __08/09/2013__
☐ **Superior**
☒ **State**        **Docket#** _____        **MM-DD-YYYY**

**Plaintiff(s)**

__Transcardiac Therapeutics, Inc.__
Last        First        Middle I.    Suffix Prefix    Maiden

_____
Last        First        Middle I.    Suffix Prefix    Maiden

_____
Last        First        Middle I.    Suffix Prefix    Maiden

_____
Last        First        Middle I.    Suffix Prefix    Maiden

**No. of Plaintiffs** _____1_____

**Plaintiff/Petitioner's Attorney**        ☐ **Pro Se**

__Beightol        Kristen    L.            Esq.__
**Last            First        Middle I.            Suffix**

**Bar #** _____425814_____

**Defendant(s)**

__Yoganathan    Ajit                Ph.D.__
Last        First        Middle I.    Suffix Prefix    Maiden

__Jiminez        Jorge    H.        Ph.D.__
Last        First        Middle I.    Suffix Prefix    Maiden

__Thourani    Vinod    H.        M.D.__
Last        First        Middle I.    Suffix Prefix    Maiden

__Emory University__
Last        First        Middle I.    Suffix Prefix    Maiden

__Georgia Tech Research Corporation__
Last        First        Middle I.    Suffix Prefix    Maiden

__Georgia Tech Foundation, Inc.__
Last        First        Middle I.    Suffix Prefix    Maiden

_____
Last        First        Middle I.    Suffix Prefix    Maiden

_____
Last        First        Middle I.    Suffix Prefix    Maiden

**No. of Defendants** _____6_____

**Check Primary Type** (Check only **ONE**)

☒ Contract/Account
☐ Wills/Estate
☐ Real Property
☐ Dispossessory/Distress
☐ Personal Property
☐ Equity
☐ Habeas Corpus
☐ Appeals, Reviews
☐ Post Judgment Garnishment, Attachment, or Other Relief
☐ Non-Domestic Contempt
☐ Tort (if tort, fill in right column)
☐ Other General Civil Specify _____
_____

**If Tort is Case Type:**
Check no more than **TWO**

☐ Auto Accident
☐ Premises Liability
☐ Medical Malpractice
☐ Other Professional Negligence
☐ Product Liability
☐ Other Specify _____

**Are Punitive Damages Pleaded?**    ☐ Yes    ☐ No